UNITED STATES of America,
Plaintiff–Appellee,

v.

Bee TYLER, Defendant–Appellant.

No. 97–1649.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1997.

Decided Sept. 29, 1997.

Estaban F. Sanchez (argued), James E. Beckman, Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Jon G. Noll, Robert Grand (argued), Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Bee Tyler pleaded guilty to a charge that she conspired to distribute in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. § 846. At sentencing, Judge Mills deemed Tyler accountable for distributing 167.83 kilograms of marijuana. The judge also concluded that Tyler had possessed a firearm during the commission of her narcotics trafficking activities (*see* U.S.S.G. § 2D1.1(b)(1) (Nov. 1995)), a determination that not only enhanced her offense level but rendered her ineligible for sentencing relief pursuant to the "safety valve" provisions of 18 U.S.C. § 3553(f) and section 5C1.2 of the Sentencing Guidelines. *See* 18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(2). The final sentencing range was fifty-seven to seventy-one months, with a floor of sixty months imposed by the statute. *See* 21 U.S.C. §§ 841(b)(1)(B)(vii); U.S.S.G. § 5G1.1(c)(2).

After granting the government's request for a downward departure in view of Tyler's cooperation with the authorities (see U.S.S.G. § 5K1.1), the judge ordered her to serve a prison term of forty-eight months. Tyler appeals her sentence, arguing that the district court erred in both the drug quantity calculation and in finding that she had possessed a firearm in connection with her drug distribution. She also contends that the district court erred in refusing to grant her a further downward departure in view of the fact that she is confined to a wheelchair and suffers from a number of medical ailments. *See* U.S.S.G. § 5H1.4.

■ The drug quantity calculation is a factual determination that we ordinarily review for clear error. *E.g., United States v. Taylor*, 116 F.3d 269, 273 (7th Cir.1997). However, Tyler's failure to make any objection to the drug quantity calculation below confines our review in this case to one for plain error. Fed.R.Crim.P. 52(b); *United States v. Cooper*, 39 F.3d 167, 172 (7th Cir.1994). We find no such error.

■ It was clear from the very outset of the case that more than 100 kilograms of marijuana were involved. The indictment itself alleged that Tyler conspired to distribute in excess of that amount. R. 1 at 1. Consistent with that allegation, the prosecution, when it outlined the factual basis for Tyler's guilty plea at the change of plea hearing, indicated that if the case proceeded to trial it would introduce evidence establishing that she was responsible for distributing between 100 and 400 kilograms of marijuana. R. 19, Tr. Aug. 5, 1996 at 17–18. Judge Mills then questioned Tyler about the government's recitation of the facts, and he specifically asked whether the conspiracy with which she was charged involved between 100 and 400 kilograms of marijuana as the prosecutor had represented. *Id.* at 19. Tyler at first said that she did not know what the word "kilograms" meant. *Id.* But when her attorney intervened and explained that a kil-

ogram was equivalent to 2.2 pounds, she acknowledged that the government's figure was correct. *Id.* (Tyler's counsel also said that he agreed with the proffer. *Id.* at 18.) Tyler now insists that her acknowledgment was casual and unknowing, but we are given no reason to believe that is so. On the contrary, the fact that Tyler asked what a kilogram was suggests that she was listening carefully to the court's questions, making sure that she understood them, and taking care that her answers were accurate, as the court had urged her to do at the outset of the hearing. *Id.* at 4. Nothing whatsoever suggests that she remained confused or ignorant after her question was answered.

Subsequently, the probation officer put the total amount of marijuana that Tyler had distributed at 167.83 kilograms, or 370 pounds. R. 30, PSR ¶ 14. That figure derived from the premise that the conspiracy had lasted thirty-eight weeks [1] and that, with the exception of a twenty-pound quantity of marijuana that took three weeks for Tyler to distribute, Tyler had distributed ten pounds per week over the life of the conspiracy. *Id.* We have previously endorsed the methodology that the probation officer employed (*e.g., United States v. Carraway*, 108 F.3d 745, 757 (7th Cir.1997) (per curiam), *petition for cert. filed* (U.S. July 28, 1997) (No. 97–5380)), and after reviewing the record we cannot find any reason why the district court was not entitled to rely on the result in the absence of objection from the defendant herself. We note in that regard that the probation officer's calculations were based upon Tyler's own statements to the authorities following her arrest. PSR ¶ 14. The only reason Tyler offers us to doubt the reliability of her own statements is what she characterizes as the patent inconsistency between the fact that it took her three weeks to sell the twenty pounds of marijuana she received on one occasion (an average rate of less than seven pounds per week) and yet she was otherwise able to distribute ten pounds per week. These facts are not irreconcilable,

---

[1] Tyler suggests that the number of weeks she was presumed to be involved in the conspiracy is "possibly" inaccurate. (Tyler Br. 22.) Yet, the thirty-eight week time frame is consistent with the allegations of the indictment (R. 1 at 1), Tyler stipulated to the time frame of the conspiracy in pleading guilty (see Tr. Aug. 5, 1996 at 17, 18 19), and she has cited no evidence whatsoever calling into doubt its accuracy.

however. Keeping in mind that we are speaking of averages, and that Tyler's actual weekly sales may have fluctuated over the life of the conspiracy, it is not at all difficult to imagine that at certain times during the conspiracy she did not meet the ten-pound-per-week average and at other times exceeded it. Whatever the actual case may be, there is nothing in the record that would make it so implausible as to be plain error to credit Tyler's own ten-pounds-per week estimate. We therefore reject Tyler's belated challenge to the drug quantity.

 Tyler's objection to the gun-related enhancement is also unavailing. Guidelines section 2D1.1(b)(1) provides for a two-level increase in the base offense level for narcotics offenses "if a dangerous weapon (including a firearm) was possessed." Application Note 3 explains:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

United States Sentencing Commission, *Guidelines Manual*, § 2D1.1 comment. (n.3) (Nov.1995). Although it is the government's initial burden to prove by a preponderance of the evidence "that the defendant possessed a weapon in a place where drugs were present," the burden of persuasion then falls upon the defendant to demonstrate that it is "clearly improbable" that the weapon was connected with her drug trafficking. *United States v. Booker*, 115 F.3d 442, 443 (7th Cir.1997) (per curiam). The relationship (or lack of one) between the weapon and the underlying offense amounts to a factual assessment, so our review of the district court's determination is one for clear error. *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir.1997); *see also United States v. Hall*, 109 F.3d 1227, 1235 (7th Cir.1997), *petition for cert. filed* (U.S. June 26, 1997) (No. 96–9561).

When police officers searched Tyler's apartment, they found a jewelry box atop a shelf inside of her bedroom closet, and inside was a Raven Arms .25 caliber semi-automatic handgun in a black leather holster. The gun was loaded: six rounds of ammunition were found in the magazine and another in the firing chamber. Within a Crown Royal whiskey bag found in a chest of drawers in the bedroom, officers discovered another magazine containing five rounds of .25 caliber ammunition. Marijuana residue and drug-related paraphernalia were also discovered in that bedroom, and 99.4 grams of marijuana were found within the environs of Tyler's home. Robert Thomas, a long-time acquaintance of Tyler's as well as a former customer, testified at sentencing that he had noticed a gun in Tyler's possession on some eight to ten of the more than twenty occasions he had visited her home. He described it as a small handgun with a black case. He first saw the gun in the kitchen in a cookie can with some rolling papers he and Tyler used to smoke marijuana. Subsequently he observed her carry the gun with her in her wheelchair, keeping it beneath one of her legs as she escorted customers into and out of her bedroom to conduct business. Thomas said that after he purchased marijuana, Tyler would escort him to the door with the gun in hand.

 Without question, then, Tyler possessed a weapon, and in view of the evidence we have summarized, it was by no means "clearly improbable" that the gun was connected with Tyler's narcotics activities. *See United States v. Pippen*, 115 F.3d 422, 425–26 (7th Cir.1997). Tyler argues in the first instance that the gun found on the closet shelf in her bedroom was inaccessible to her and thus cannot be considered for purposes of the enhancement. But to the extent that the gun's accessibility to Tyler is relevant, the record does not disclose one way or another how high the shelf was and thus how easily Tyler could have gained access to the weapon. In any event, in view of Thomas' testimony that she carried a gun with her about the house in the course of her marijuana sales, that is a moot point. Tyler suggests that Thomas' testimony was tainted by a conflict of interest she attributes to her trial counsel. At the start of the sentencing hearing, Tyler's counsel, Monroe McWard,

disclosed that he had previously consulted with Thomas in connection with the same investigation that had inculpated Tyler. McWard sought leave to withdraw as Tyler's counsel (and alternatively for a continuance) for that reason, concerned that it might be necessary for him to cross-examine Thomas about matters the two had discussed. But Thomas had never retained McWard, and neither McWard nor Thomas could recall ever discussing Tyler's possession of the gun, which was the sole matter on which he was called to testify. Finding no conflict of interest under these circumstances, the district court denied McWard's motion to withdraw and proceeded with the hearing. Tyler cursorily contends that the court's decision was erroneous, but the court's inquiry into the possibility of conflict was thorough and Tyler has given us no reason to disturb it. We therefore find no error in the weapons enhancement.

■ Finally, Tyler contends that the district court abused its discretion in denying her request for a downward departure based on her medical condition (*see* U.S.S.G. § 5H1.4), but we lack jurisdiction to reach this issue. Tyler contracted polio at the age of two and has been confined to a wheelchair for more than thirty years; she has also had several surgeries over the years to address other conditions attributable to that infection. In 1996, while she awaited sentencing, Tyler suffered a heart attack and underwent bypass surgery to correct occlusion of her coronary arteries. She takes several medications daily for high blood pressure and other ailments. The district court plainly recognized that it had the authority to depart downward based on Tyler's physical status. *See* R. 33, March 17, 1997 Sentencing Order at 3, citing *United States v. Sherman*, 53 F.3d 782, 786 (7th Cir.1995). In its discretion, however, the court found the evidence before it insufficient to establish that Tyler's condition was so extraordinary as to warrant a departure. We are precluded from review of this determination. *United States v. Helton*, 975 F.2d 430, 434 (7th Cir.1992).

Bee Tyler's story is, as everyone agrees, a tragic one. After a lifetime of difficulty, Tyler last month had to mark her fiftieth birthday behind prison walls. Judge Mills remarked that sentencing her was one of the most difficult tasks he had faced in his thirty-one years as a judge. Yet, as he also noted, Ms. Tyler took part in a conspiracy to distribute relatively large amounts of marijuana. The narcotics laws exact a harsh penalty for such activity. Fortunately, her sentence was significantly less than it would have been had she not cooperated with the authorities.

We AFFIRM Tyler's sentence.